IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| JAMI LYNN GOLDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION FILE NO. _____ |
| | * | |
| FLOYD HEALTHCARE | * | |
| MANAGEMENT, INC. d/b/a | * | |
| FLOYD MEDICAL CENTER, | * | |
| FLOYD EMERGENCY | * | |
| PHYSICIANS, LLC a/k/a FLOYD | * | |
| EMERGENCY PHYSICIANS | * | |
| GROUP, LLC, GARRETT H. | * | |
| BARNES, M.D., CHARLES W. | * | |
| STEIN, N.P., DANNY R. ROGERS, | * | |
| P.A., and ETOWAH EMERGENCY | * | |
| PHYSICIANS, LLC. | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Jami Lynn Golden and files her Complaint for

Damages against the Defendants named above, showing the Court as follows:

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

#### Nature of the Case

1.     This is an action by Plaintiff Jami Lynn Golden ("Ms. Golden")

claiming compensatory damages for personal injuries.

## Parties, Jurisdiction, and Venue

2.      The Plaintiff is a citizen and resident of Alabama.  All Defendants are citizens and residents of Georgia.  None of the Defendants is a citizen or resident of Alabama.

3.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Jurisdiction in this court is founded on diversity of citizenship pursuant to 28 U.S.C. §1332.

5.      Jurisdiction in this court is also founded on federal question jurisdiction under 28 U.S.C. § 1331 as EMTALA claims are asserted under 42 U.S.C. § 1395dd(c)(2)(a).

6.      This court also has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims for negligence and abandonment asserted in this action that are so related to her EMTLA claims within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      The transactions, events, occurrences, acts, and omissions giving rise to the Plaintiff's claims asserted herein arose within this state, district, and division.

8.      All the Defendants are citizens and residents of this state and district.

Case 4:18-cv-99997-UNA   Document 78   Filed 06/20/18   Page 3 of 59

9.     All the Defendants are subject to personal jurisdiction in this state and district.

10.     All the corporate Defendants have a registered office and registered agent in this state and district.

11.     All the corporate Defendants have an office, place of business, agents, and employees in this state, district, and division.

12.     Therefore, venue properly lies in this district and division pursuant to 28 U.S.C. §1391(b)(1) and (2), and N.D. Ga. LR 3.1 B(1)(a).

## Parties

13.     Plaintiff Ms. Golden is a citizen and resident of the State of Alabama, residing at 813 St. James Ct., Pike Road, Montgomery County, Alabama 36064.

14.     At all relevant times Ms. Golden was an employee of Winshape Camps, 2277 Martha Berry Circle N, Mount Berry, Floyd County, Georgia 30149.

15.     Defendant Floyd Healthcare Management, Inc. ("Floyd Healthcare") d/b/a Floyd Medical Center is a domestic corporation organized under Georgia law, and is a citizen and resident of this state, district, and division.

16.     Defendant Floyd Healthcare operates and manages the Floyd Medical Center in Rome, Georgia, and the Polk Medical Center in Cedartown, Georgia.

17.     At all relevant times Defendant Floyd Healthcare's principal office and place of business was, and still is, located at Floyd Medical Center, 304 Turner McCall Blvd SW, Rome, Floyd County, Georgia 30165 in this state, district, and division.

18.     Defendant Floyd Healthcare may be served by delivering the summons and complaint to its registered agent, Thomas H. Manning, at his registered address, 420 East Second Avenue, Rome, Floyd County, Georgia 30161 or at his principal place of business, 100 East 2nd Avenue 400, Rome, Floyd County, Georgia 30161.

19.     Defendant Floyd Emergency Physicians, LLC a/k/a Floyd Emergency Physicians Group, LLC ("Floyd Emergency") is a Domestic Limited Liability Company organized under the laws of Georgia, with its principal place of business located at the Floyd Medical Center Emergency Department, 304 Turner McCall Blvd, Rome, Floyd County, Georgia 30165.

20.     Defendant Floyd Emergency may be served by delivering the summons and complaint to its registered agent, Thomas H. Manning, at his registered address, 420 East Second Avenue, Rome, Floyd County, Georgia 30161.  Alternatively, Defendant Floyd Emergency may be served by delivering summons and complaint to its registered agent, Thomas H. Manning, at his principal place of business, 100 East 2nd Avenue 400, Rome, Floyd County, Georgia 30161.

Case 4:18-cv-00057-UNA Document 78 Filed 06/30/18 Page 5 of 59

21.     Defendant Garrett H. Barnes, M.D. ("Dr. Barnes") is a citizen of the State of Georgia, residing at 6 Haley Drive SE, Rome, Floyd County, Georgia 30161.

22.     Defendant Dr. Barnes may be served by delivering the summons and complaint to him at his residence address located at 6 Haley Drive SE, Rome, Floyd County, Georgia 30161.  Alternatively Defendant Dr. Barnes may be served by delivering the summons and complaint to him during his duty hours at the Floyd Medical Center Emergency Department located at 304 Turner McCall Blvd, Rome, Floyd County, Georgia 30165.

23.     Defendant Charles William Stein, N.P. ("NP Stein") is a citizen of the State of Georgia, residing at 599 Mango Road, NE, Rome, Floyd County, Georgia 30161.

24.     Defendant NP Stein may be served by delivering the summons and complaint to him at his residence address located at 599 Mango Road, NE, Rome, Floyd County, Georgia 30161.  Alternatively Defendant NP Stein may be served by delivering the summons and complaint to him during his duty hours at the Floyd Medical Center Emergency Department located at 304 Turner McCall Blvd, Rome, Floyd County, Georgia 30165.

25.     Defendant Danny Ray Rogers, P.A. ("PA Rogers") is a citizen of the State of Georgia, residing at 5 Buggy Ride Court, NW, Rome, Floyd County, Georgia 30165.

26.     Defendant PA Rogers may be served by delivering the summons and complaint to him at his residence address located at 5 Buggy Ride Court, NW, Rome, Floyd County, Georgia 30165.  Alternatively Defendant PA Rogers may be served by delivering the with summons and complaint to him during his duty hours at the Floyd Medical Center Emergency Department located at 304 Turner McCall Blvd, Rome, Floyd County, Georgia 30165.

27.     Defendant Etowah Emergency Physicians, LLC ("Etowah Emergency") is a Domestic Limited Liability Company organized under the laws of Georgia, with its principal place of business located at 5665 New Northside Drive, Suite 320, Atlanta, GA, 30328.

28.     Defendant Etowah Emergency has a place of doing business located in this district and division at Floyd Medical Center Emergency Department, 304 Turner McCall Blvd, Rome, Floyd County, Georgia 30165.

29.     Defendant Etowah Emergency may be served by delivering the summons and complaint to its registered agent, CSC of Cobb County, Inc., at its

registered address, 192 Anderson Street SE, Suite 125, Marietta, Cobb County, Georgia 30060.

### Relationships of the Defendants Among One Another

30.     At all relevant times Defendant Floyd Healthcare operated and managed Floyd Medical Center as an acute care hospital, emergency care center, and regional referral center at its principal place of business, 304 Turner McCall Blvd, Rome, Floyd County, Georgia, 30165 in this state, district, and division.

31.     Defendant Floyd Healthcare provides emergency hospital and medical services to patients at the Floyd Medical Center Emergency Department (sometimes referred to as the "Emergency Care Center").

32.     At all relevant times Defendant Floyd Healthcare held out the Floyd Medical Center as providing in-hospital care and services, outpatient care and services, family medicine care and services, emergency department care and services, and after-hours care and services to patients.

33.     At all relevant times Defendant Floyd Healthcare held out the Floyd Medical Center as medical care facility providing emergency care, hospital care and nursing care consistent with the legal standard of care required of those who provide such services.

34.     At all relevant times Defendant Floyd Emergency held itself out to the public as an emergency medicine services provider that provided emergency medical services to patients consistent with the legal standard of care required of those who provide such services.

35.     At all relevant times Defendant Floyd Emergency was a wholly owned and controlled subsidiary of Floyd Healthcare.

36.     At all relevant times to this action, Defendant Floyd Emergency was a Georgia limited liability company whose sole purpose was to provide emergency physician and mid-level healthcare staffing in the Floyd Medical Center Emergency Department and the Polk Medical Center Emergency department through its agents, employees, contractors, and joint venturers.

37.     At all relevant times Defendant Floyd Emergency provided physician and mid-level healthcare staffing in the Floyd Medical Center Emergency Department and the Polk Medical Center Emergency Department

38.     At all relevant times Defendant Floyd Emergency was an agent of Defendant Floyd Healthcare, acting within the scope of its agency, in pursuit of Defendant Floyd Healthcare's business in the Floyd Medical Center Emergency Department.  Defendant Floyd Healthcare is subject to liability for harm caused by Floyd Emergency's agents or employees wrongful acts or omissions.

39. Alternatively, at all relevant times Defendant Floyd Emergency was an independent contractor that undertook to perform non-delegable duties imposed on Defendant Floyd Healthcare by statute, regulation, or contract so that Defendant Floyd Healthcare is subject to liability for harm caused by the wrongful acts and omissions of Floyd Emergency's agents or employees in performing or failing to perform those non-delegable duties.

40. At all relevant times Defendant Dr. Barnes was a board-certified emergency medicine physician licensed to practice in the State of Georgia.

41. At all relevant times Defendant Dr. Barnes held himself out to the public as an emergency medicine physician who provided emergency medical services to patients consistent with the legal standard of care required of those who provide such services.

42. At all relevant times Defendant Dr. Barnes was an agent or employee of Defendant Floyd Healthcare, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Healthcare's business in the Floyd Medical Center Emergency Department.

43. At all relevant times Defendant Dr. Barnes was acting within the scope of his agency or employment. Defendant Floyd Healthcare is subject to liability for harm caused by his wrongful acts or omissions.

44. Alternatively, at all relevant times Defendant Dr. Barnes was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Healthcare by statute, regulation, or contract. Defendant Floyd Healthcare is subject to liability for harm caused by Dr. Barnes' wrongful acts and omissions in performing or failing to perform those non-delegable duties.

45. At all relevant times Defendant Dr. Barnes was an agent or employee of Defendant Floyd Emergency, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Emergency's business in the Floyd Medical Center Emergency Department. Defendant Floyd Emergency is subject to liability for harm caused by his wrongful acts or omissions.

46. Alternatively, at all relevant times Defendant Dr. Barnes was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Emergency by statute, regulation, or contract. Defendant Floyd Emergency is subject to liability for harm caused by Dr. Barnes' wrongful acts and omissions in performing or failing to perform those non-delegable duties.

47. At all relevant times Defendant NP Stein was a nurse practitioner licensed to practice nursing in the State of Georgia. The scope of his healthcare practice was limited to performing those functions permitted by the laws and

regulations of this state and the terms of his license, and he was required to practice under the supervision and direction of a primary physician.

48.    At all relevant times Defendant NP Stein held himself out to the public as a licensed nurse practitioner who provided medical and emergency room services to patients consistent with the legal standard of care required of those who provide such services and within the scope of his license or permit.

49.    At all relevant times Defendant NP Stein was an agent or employee of Defendant Floyd Healthcare, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Healthcare's business.  Defendant Floyd Healthcare is subject to liability for harm caused by NP Stein's wrongful acts or omissions.

50.    Alternatively, at all relevant times Defendant NP Stein was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Healthcare by statute or contract.  Defendant Floyd Healthcare is subject to liability for harm caused by NP Stein's wrongful acts and omissions in performing or failing to perform those non-delegable duties.

51.    At all relevant times Defendant NP Stein was an agent or employee of Defendant Floyd Emergency, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Emergency's business.  Defendant Floyd Emergency is subject to liability for harm caused by NP Stein's wrongful acts or omissions.

52.     Alternatively, at all relevant times Defendant NP Stein was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Emergency by statute or contract.  Defendant Floyd Emergency is subject to liability for harm caused by NP Stein's wrongful acts and omissions in performing or failing to perform those non-delegable duties.

53.     At all relevant times Defendant PA Rogers was a Physician's Assistant licensed to practice in the State of Georgia.  The scope of his healthcare practice was limited to performing those functions permitted by the laws and regulations of this state and the terms of his license, and he was required to practice under the supervision and direction of a primary physician.

54.     At all relevant times Defendant PA Rogers held himself out to the public as a licensed Physician's Assistant who provided medical and emergency room services to patients consistent with the legal standard of care required of those who provide such services and within the scope of his license or permit.

55.     At all relevant times Defendant PA Rogers was an agent or employee of Defendant Floyd Healthcare, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Healthcare's business.  Defendant Floyd Healthcare is subject to liability for harm caused by PA Rogers' wrongful acts or omissions.

12

56.     Alternatively, at all relevant times Defendant PA Rogers was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Healthcare by statute or contract.  Defendant Floyd Healthcare is subject to liability for harm caused by PA Rogers' wrongful acts and omissions in performing or failing to perform those non-delegable duties.

57.     At all relevant times Defendant PA Rogers was an agent or employee of Defendant Floyd Emergency, acting within the scope of his agency or employment, in pursuit of Defendant Floyd Emergency's business.  Defendant Floyd Emergency is subject to liability for harm caused by PA Rogers' wrongful acts or omissions.

58.     Alternatively, at all relevant times Defendant PA Rogers was an independent contractor who undertook to perform non-delegable duties imposed on Defendant Floyd Emergency by statute or contract so that Defendant Floyd Emergency is subject to liability for harm caused by PA Rogers' wrongful acts and omissions in performing or failing to perform those non-delegable duties.

59.     Defendant Etowah Emergency was formed and registered as a Georgia corporation with the Office of the Georgia Secretary of State on or about October 11, 2016.

60.    Defendant Etowah Emergency is an emergency medicine healthcare provider in Rome, Floyd County, Georgia whose sole purpose and mission at the Floyd Medical Center was to acquire the assets, agents, and employees of Floyd Emergency, replace it, and take over its role of providing physician and mid-level healthcare staffing in the Floyd Medical Center Emergency Department in Rome, Floyd County, Georgia.

61.    Defendant Etowah Emergency contracted with Floyd Healthcare to become the exclusive provider of emergency physicians and mid-level healthcare professional staffing in the Floyd Medical Center Emergency Department.

62.    On information and belief, Etowah Emergency has acquired the assets, agents, and employees of Floyd Emergency, has directly or indirectly assumed its liabilities, has replaced it, and has taken over its role of providing physicians and mid-level healthcare staffing in the Floyd Medical Center Emergency Department in Rome, Floyd County, Georgia.

63.    On information and belief, Etowah Emergency is subject to liability for injuries and harm caused by the wrongful acts or omissions of its predecessor in interest, Floyd Emergency, and its agents, employees, and contractors, including Dr. Barnes, NP Stein, and PA Rogers because it has assumed such liabilities, directly or indirectly.

## Conditions Precedent

64.     All conditions precedent to the filing of this action and to the Plaintiff's right to the relief sought have occurred, have been performed, or have been excused.

65.     All of the Defendants possess non-public and non-charitable assets, including income earned from fee paying patients, and liability insurance policies sufficient to satisfy any judgment rendered in this action.

66.     The Plaintiff Ms. Golden has complied with O.C.G.A. § 9-11-9.1 by filing along with this complaint the affidavit of Louis P. Ciamillo, Jr., M.D. attached hereto and incorporated by reference.  This affidavit sets forth at least one negligent act or omission by Dr. Barnes, NP Stein, and PA Rogers chargeable to Floyd Healthcare, Floyd Emergency, and Etowah Emergency Physicians that proximately caused serious personal injury to Plaintiff Ms. Golden.

## Basic Allegations

67.     At all relevant times Defendant Floyd Healthcare d/b/a Floyd Medical Center participated in the Medicare and Medicaid reimbursement programs. Defendant Floyd Healthcare entered into an agreement with the U. S. Secretary of Health and Human Services to comply with all conditions of participation in those programs.

68.    At all relevant times Defendant Floyd Healthcare held the Floyd Medical Center out to the Georgia Department of Community Health, the Federal Department of Health and Human Services, and the public as a hospital with an emergency department that operated in compliance with Joint Commission on Accreditation of Healthcare Organization ("JCAHO") standards.

69.    At all relevant times Defendant Floyd Healthcare operated an emergency service at Floyd Medical Center with a director who was required to assure that the emergency service was operated in compliance with all legal requirements and with JCAOH standards, as well as the standard of care for providing emergency services.

70.    At all relevant times Defendant Floyd Healthcare as operator of Floyd Medical Center, owed non-delegable legal duties to the general public, including Plaintiff Ms. Golden, imposed upon it by:

(a)    *O.C.G.A.* §§ 31-7-1 *et seq* and administrative regulations adopted thereunder by the Georgia Department of Community Health, Ga. Adm. Code §§ 111-8-40-.01 *et seq*;

(b)    The Federal Social Security Act (42 U.S.C. §1395x(e)), and administrative regulations adopted thereunder by the U. S. Secretary of

Health and Human Services (42 C.F.R. Part 482 "Conditions of participation for Hospitals" in the Medicare reimbursement program);

(c)   The express contract Defendant Floyd Healthcare voluntarily entered into with the U. S. Secretary of Health and Human Services to participate in the Medicare reimbursement programs and to abide by all conditions of participation, whereby Hospital assumed the contractual duty to provide its patients with non-negligent emergency medical care, including nursing services, within "acceptable standards of practice".

(d)   The express contract Defendant Floyd Healthcare entered into with Plaintiff Ms. Golden to provide her with non-negligent physician, mid-level healthcare, nursing, and hospital services, whereby Floyd Medical Center assumed and undertook the contractual duty to provide such services within the acceptable standard of care imposed by O.C.G.A. § 51-1-27.

71.   At all relevant times Defendant Floyd Healthcare d/b/a Floyd Medical Center was a "participating hospital" within the meaning of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. Law No. 99-272, §9121, 100 Stats. 164-167, Codified at 42 U.S.C. §§ 1320a – 1327a, 1395cc, 1395dd, and 1395x (hereafter referred to as the "EMTALA Law").

72.    At all relevant times Defendant Floyd Healthcare was subject to a non-delegable duty to comply with the requirements of the EMTALA Law for the benefit of members of the public, including the Plaintiff, who presented to Floyd Medical Center Emergency Department seeking medical examination and treatment.

73.    At all relevant times Defendant Floyd Emergency was obligated by a contract with Floyd Healthcare to provide emergency medical services, emergency medical physicians and mid-level healthcare professionals staffing for the Floyd Medical Center Emergency Department.

74.    Under such contract and under O.C.G.A. § 51-1-27 both Floyd Healthcare and Floyd Emergency had non-delegable duties to render to patients emergency medical care within the legal standard of care required of emergency medical physicians, and emergency medical mid-level healthcare professionals who engage in providing such services.

75.    Under such contract both Floyd Healthcare and Floyd Emergency had non-delegable duties to train, direct, and supervise mid-level healthcare providers in the Floyd Medical Center Emergency Department to assure they limited their practice, care, and treatment to performing only those functions permitted by the laws and regulations of this state and the terms of their license or permit and did not exceed the scope of their license or permit.

76.    Under such contract and applicable laws and regulations both Floyd Healthcare and Floyd Emergency had non-delegable duties to promulgate rules, policies, procedures, protocols, and standards for processing patients presenting for emergency care, initial patient assessment, prioritization for medical screening and treatment, patient reassessment and monitoring, and guidance for emergency interventions by non-physician staff.

77.    On July 1, 2016, Defendant Dr. Barnes was, by contract and medical staff bylaws, the attending and supervising physician on duty who undertook to staff the Floyd Medical Center Emergency Department and discharge Defendant Floyd Healthcare's and Floyd Emergency's duties arising under Georgia laws and hospital regulations, the federal EMTALA Law, and applicable federal Medicare and Medicaid regulations applicable to participating hospitals, for the benefit of members of the public, including the Plaintiff Ms. Golden, who presented to the Floyd Medical Center emergency room seeking medical examination and treatment.

78.    As attending and supervising emergency room physician, Defendant Dr. Barnes undertook to act on behalf of Defendants Floyd Healthcare and Floyd Emergency for the purposes of providing emergency medical diagnosis, testing, screening, care, admission, referral and treatment to the members of the public who presented themselves at the emergency room of Floyd Medical Center during the

hours of his duty assignment as required by Georgia laws and regulations, the EMTALA Law, and applicable federal Medicaid regulations applicable to participating hospitals.

79.     As attending and supervising emergency room physician, Defendant Dr. Barnes undertook to act on behalf of Defendants Floyd Healthcare and Floyd Emergency for the purposes of training, supervising, and directing nurse practitioners, including NP Stein, and assuring they rendered to patients emergency medical and mid-level care within the scope of their licenses and within the legal standard of care required of emergency medical mid-level healthcare professionals who engage in providing such services.

80.     As attending and supervising emergency room physician, Defendant Dr. Barnes undertook to act on behalf of Defendants Floyd Healthcare and Floyd Emergency for the purposes of training, supervising, and directing physicians assistants, including PA Rogers, and assuring they rendered to patients emergency medical and mid-level care within the scope of their licenses and within the legal standard of care required of emergency medical mid-level healthcare professionals who engage in providing such services.

81.     On July 1, 2016, at approximately 8:24 p.m., the Plaintiff Ms. Golden presented to the Floyd Medical Center Emergency Department ("Floyd ER") and

requested medical examination and treatment with a chief complaint of severe abdominal pain ("9 out of 10"), chills, nausea, and vomiting.

82.     Upon admission Ms. Golden executed a written hospital admission form that is an express contract between Floyd Healthcare and Floyd Emergency and Ms. Golden to provide her with emergency medical services consistent with the standard of care required for hospitals and emergency departments, physicians, and other staff that provide such services and within the scope of their licenses or permits.

83.     On July 1, 2016, at approximately 8:28 p.m., the Plaintiff was admitted as a patient to the Floyd Medical Center Emergency Department by Amanda Champion, RN ("Nurse Champion"), an agent and employee of Defendant Floyd Healthcare.

84.     At approximately 8:29 p.m., Nurse Champion performed a triage assessment of Ms. Golden on behalf of the Floyd Medical Center Emergency Department and recommended an Emergency Severity Index (ESI) level of "3 – Urgent".

85.     Upon presentation Ms. Golden had initial vital signs including a low-grade fever of 99.5° F, a heart rate of 118 bpm, blood pressure of 111/64 mmHg and pulse oxygenation of 99%, with a respiratory rate of 20.

86.     Upon presentation Ms. Golden met 1 criterion of Systemic Inflammatory Response Syndrome (SIRS) – her pulse of 118 was greater than 90.

87.     A patient must meet 2 SIRS criteria plus have a concerning source for infection to meet the accepted sepsis threshold.

88.     At all relevant times Defendant Dr. Barnes was the supervising attending Physician in the Floyd Medical Center Emergency Department on July 1-2, 2016, throughout Ms. Golden's admission, treatment, and discharge.

89.     At all relevant times Defendant NP Stein was a nurse practitioner and a mid-level provider charged with managing Ms. Golden's care during her admission in the Floyd Medical Center Emergency Department on July 1-2, 2016 until the end of his shift at or about 12:00 p.m. on July 1, 2016.

90.     At all relevant times Defendant PA Rogers was a Physician's Assistant and a mid-level provider charged with managing Ms. Golden's care during her admission in the Floyd Medical Center Emergency Department on July 2, 2016 from the beginning of his shift at or about 12:01 a.m. on July 2, 2016 until her discharge at or about 3:02 a.m. on that date.

91.     Initially, NP Stein was assigned to manage Ms. Golden's care in the Emergency Department.

92.     NP Stein ordered a work-up for Ms. Golden that included a complete blood count with differential, comprehensive metabolic panel, lipase, urine pregnancy test, and a pelvic ultrasound.

93.     NP Stein documented that he was unable to complete a speculum exam due to pain.  However, he did perform a bimanual exam which revealed right lower quadrant tenderness, or more specifically, right adnexal tenderness.

94.     NP Stein negligently failed to document "abdominal pain" in the medical decision-making section of Ms. Golden's chart.

95.     Ms. Golden's urinalysis results revealed small bilirubin, ketones of 40 (indicating dehydration), specific gravity of greater than 1.030 (highly concentrated, also indicating dehydration), large blood, 30 Protein, and trace Leukocyte esterase.

96.     Ms. Golden's comprehensive metabolic panel results revealed potassium of 3.3 (low, likely secondary to vomiting), and elevated liver enzymes ALT 141, ALT 212, and Lipase 212 (wnl).

97.     The urine pregnancy test results were negative.

98.     The lab test results were significant. Ms. Golden's white blood count of 4.9 and Bands (immature white blood cells) of 15%.  Bands of greater than 10% are highly suggestive of an infection and qualify as an additional SIRS criterion.

Increased bands are often indicators of appendicitis, which is consistent with Ms. Golden's presenting complaints.

99.   Ms. Golden now met 2 SIRS criteria – a pulse rate of greater than 90 bpm and bandemia (Bands greater than 10%).

100.   From the entries in Ms. Golden's medical record, apparently NP Stein entertained two other diagnoses, (1) an ovarian cyst, and (2) endometriosis. However neither is usually associated with a fever or bandemia (Bands over 10%).

101.   NP Stein ordered Ms. Golden treatments to relieve Ms. Golden's pain and discomfort.  He medicated her with 4 mg of morphine, two doses of Zofran 4mg, 1 dose of Phenergan 12.5mg for nausea, and 1 liter of normal saline fluid resuscitation.  He ordered no treatment to address the underlying cause of her illness and pain.

102.   When NP Stein's shift ended on July 2, 2016 at about 12:00 a.m., he turned over Ms. Golden to PA Rogers, another mid-level provider for continued management of her care and condition.

103.   By 1:00 a.m. on July 2, 2016, Ms. Golden had been a patient for nearly 5 hours, and still had not been seen or examined by an emergency medicine physician.

104.   Ms. Golden's Floyd Medical Center Emergency Department medical records indicate the only diagnostic test results that had not yet been received at the time PA Rogers assumed Ms. Golden's management of her emergency care was results from her pelvis ultrasound.

105.   The medical record entries indicate NP Stein's handoff to PA Rogers was simply binary. (1) If Ms. Golden's pelvic ultrasound test results were negative, she was to be discharged home.  (2) If her ultrasound test results were positive, further work-up, diagnostic studies, and treatment would be ordered.

106.   The results of Ms. Golden's pelvic ultrasound were positive, revealing the presence of ovarian cysts, but no acute process.

107.   Despite Ms. Golden's unrelieved severe abdominal pain, her diagnostic test results meeting the criteria for the presence of sepsis due to an abdominal infection (SIRS), neither NP Stein nor PA Rogers ordered any further tests to discover the source of Ms. Golden's now evident abdominal infection and septic condition.

108.   By negligently failing to suspect and diagnose Ms. Golden's septic condition, order further studies and tests, or consult with Dr. Barnes, the attending and supervising Emergency Department physician, to inform him of Ms. Golden's condition and diagnostic test results, and request that he examine her and provide

them with guidance, both mid-level providers NP Stein and PA Rogers breached the applicable standard of care they owed to Ms. Golden under the circumstances.

109.   On July 2, 2016 at approximately 1:54 a.m., while PA Rogers was managing her care, Ms. Golden's vital signs were taken again.  The results evidenced a considerable decrease in her blood pressure and a dangerously low systolic blood pressure of 88 mmHg indicating hypotension.

110.   Ms. Golden now met 3 SIRS criteria for sepsis.

111.   On July 2, 2016 at approximately 3:02 a.m., and despite overwhelming evidence of her septic condition, PA Rogers negligently discharged Ms. Golden without any further testing, examination, or treatment by any provider or physician.

112.   PA Rogers failed to timely order a computerized tomography scan ("CT scan"), that he knew or should have known to be a more definitive diagnostic test for sepsis whenever the source of abdominal or pelvic infection has not been located or diagnosed with simpler, less definitive diagnostic tests, including a pelvic ultrasound.

113.   On discharge her blood pressure was 88/55 mmHg, her heart rate was 100 bpm, her respiratory rate was 17, and her temperature was 98° F.

114.   On discharge at approximately 3:02 a.m. on July 2, 2016, Ms. Golden had exhibited more than 2 SIRS criteria, including a low-grade fever, 9 out of 10

abdominal pain, bands of 15%, blood pressure of 88/55 mmHg, a heart rate of 100 bpm, respiratory rate of 17, persistent tachycardia, new hypotension, and urinalysis results indicating dehydration.

115.   Despite this highly probative evidence of Ms. Golden's septic condition, PA Rogers negligently discharged Ms. Golden from the Floyd Medical Center Emergency Department at approximately 3:02 a.m. on July 2, 2016.

116.   PA Rogers failed to obtain any guidance or instruction from supervising and attending emergency physician Dr. Barnes prior to discharging Ms. Golden.

117.   Under the circumstances, and Ms. Golden's obvious medical condition on discharge as evidenced by the medical records, the applicable standard of care required her mid-level providers to notify the supervising and attending physician and request him to examine her and admit her to Floyd Medical Center's Intensive Care Unit for further testing and evaluation, including a CT scan, and appropriate medical treatment for a septic condition, including determining and treating the source of infection, monitoring, managing, and relieving Ms. Golden's tachycardia, hypotension, and dehydration by administering appropriate and timely antibiotics, fluids, and vasopressors, and protecting her against multiple organ injury and necrosis.

118. Instead of admitting Ms. Golden to Floyd Medical Center for further testing and appropriate medical treatment for her septic condition, PA Rogers, discharged her from the Emergency Department at approximately 3:02 a.m. on July 2, 2016 and sent her home with a prescription for pain medication and recommended follow-up in 2-3 days.

119. By negligently discharging Ms. Golden and terminating her medical care without having first identified or treated an obvious septic abdominal infection, PA Rogers deprived her of timely and appropriate emergency medical treatment and unnecessarily exposed Ms. Golden to serious bodily injury or death. In so doing, PA Rogers breached the applicable standard of care he owed to Ms. Golden under the circumstances and was grossly negligent under the circumstances.

120. After nearly 7 hours as a patient in the Floyd ER, Ms. Golden was prematurely discharged by her mid-level provider PA Rogers in an obvious septic condition without having ever been seen or examined by an emergency physician.

121. Ms. Golden's Floyd Medical Center Emergency Department medical records do not indicate whether either NP Stein and PA Rogers ever notified Dr. Barnes, their supervising attending physician, of her initial presentation to the Floyd Medical Center Emergency Department, her vital signs during her admission, the results of Ms. Golden's diagnostic tests, or her condition on discharge.

122.   Prior to discharging Ms. Golden, Defendants NP Stein and PA Rogers failed to timely and properly notify and consult with their supervising physician Dr. Barnes, or request him to examine and evaluate her, and give them appropriate advice about the management of her obvious evidence of her septic condition and, and her rapidly declining health.

123.   NP Stern and PA Rogers undertook to make an unsupervised medical diagnosis of Ms. Golden's condition and treat it without a physician's direction.

124.   Making a medical diagnosis is beyond the scope of the license of a nurse practitioner or physician's assistant.

125.   NP Stern's and PA Rogers' acts and omissions were neither supervised, ordered, nor directed by a physician, and were a grossly negligent breach of the applicable standard of care.  Their acts and omissions were also negligence *per se* in violation of O.C.G.A. §§ 43-26-3, 43-26-7, 43-26-10, 43-34-102, 43-34-105, 43-34-109; 43-and Ga. Adm. Code § 410-11-.03.

126.   Their medical diagnosis was wrong, and deprived Ms. Golden of timely and appropriate medical treatment for sepsis, which is an emergent medical condition.

127.   Ms. Golden was discharged from the Floyd Medical Center Emergency Department without a medical diagnosis of her condition ever being made or timely and appropriate treatment ordered by a licensed emergency physician.

128.   Floyd Healthcare and Floyd Emergency should have more closely supervised these mid-level healthcare providers, NP Stein and PA Rogers.  O.C.G.A. §§ 43-34-105 and 43-34-109; and Ga. Adm. Code § 410-11-.03.  Floyd Healthcare and Floyd Emergency failed to supervise these mid-level healthcare providers appropriately under the circumstances.   Their failure to do so was negligence, negligence *per se,* and gross negligence.

129.   Dr. Barnes signed Ms. Golden's Floyd Medical Center Emergency Department medical record several hours after she was discharged.

130.   On their face, these medical records do not show that Dr. Barnes was ever involved in Ms. Golden's emergency medical care.

131.   Evidence or testimony may subsequently be discovered proving that NP Stein or PA Rogers did inform Dr. Barnes of Ms. Golden's dire condition.  If so, the medical records show that Dr. Barnes did not timely or properly respond or provide Ms. Golden with necessary and appropriate care and treatment for her life-threatening septic condition clearly evidenced by her medical records at the time she was discharged from the Floyd Medical Center Emergency Department.

132.   If such evidence is discovered, it would show Dr. Barnes' acts and omissions breached the applicable standard of care for emergency medicine physicians, under those circumstances his conduct was grossly negligent.

133.   Upon her discharge Ms. Golden was immediately transported back to her summer residence at nearby Camp WinShape at Berry College in Rome, Georgia where she was employed as a camp counselor for the summer.

134.   Over the next 13 hours between the time of her discharge from Floyd Medical Center Emergency Department at approximately 3:02 a.m. and 4:00 p.m. on July 2, 2016, Ms. Golden continued to complain of severe abdominal pain, nausea, and vomiting, and she had at least one episode of loose watery diarrhea.

135.   Between approximately 3:02 a.m. on July 2, 2016, when she was discharged, and 4:00 p.m. that day, Ms. Golden also complained of a sore throat, progressive shortness of breath, and headache.

136.   During the day on July 2, 2016, Ms. Golden rapidly became worse. She could not stand without vomiting, and she became dizzy and near syncopal.

137.   On July 2, 2016, at around 4:00 p.m., approximately 13 hours after she was discharged from the Floyd Medical Center Emergency Department, Ms. Golden was transported *in extremis* to Redmond Regional Medical Center Emergency Department ("Redmond Emergency Department") by an EMS ambulance.

138.   At approximately 4:00 p.m. on July 2, 2016, Ms. Golden presented to the Redmond Emergency Department in full-blown septic shock, exhibiting signs of multiple organ failure, hypotension, and shortness of breath.

139.   Upon her presentation at the Redmond Emergency Department Ms. Golden was alert but diaphoretic, cyanotic, and she had complaints of chest pain as well as shortness of breath and abdominal pain.

140.   Upon her presentation Ms. Golden was seen and treated by Sarah Mack, M.D., the emergency physician then on duty.

141.   Upon her presentation Ms. Golden's vital signs were taken, her blood pressure was 48/29 mmHg, and her pulse was 142 bpm with strong evidence of sepsis.

142.   Immediately upon Ms. Golden's presentation to the the Redmond Emergency Department, the hospital's sepsis protocol was initiated.  This included administration of antibiotics, IV fluids and medication for hypotension, maintaining blood flow to organs, and determining and treating the source of infection.

143.   Throughout the course of her emergency admission to Redmond Emergency Department, Ms. Golden remained progressively short of breath, persistently hypotensive, and she required intubation.

144.   Once Ms. Golden's airway was secured, a central line was placed in her right internal jugular vein.  Ms. Golden was given 0.9% Normal Saline and was started on vasopressors for persistent hypotension.

145.   A chest x-ray was ordered, which revealed bilateral infiltrates suggestive of Acute Respiratory Distress Syndrome ("ARDS").

146.   Ms. Golden's white blood cell count was 15,000, her lactic acid was 5.5, her BUN was 34, and her creatinine measured at 3.5 indicating acute renal failure.

147.   Ms. Golden's AST and ALT were both elevated, and pH of her blood was 7.21 indicating acidosis.

148.   The emergency medical care rendered by the Redmond Emergency Department physician and staff met the applicable standard of care for a patient in Ms. Golden's septic condition.

149.   Ms. Golden was admitted to the Redmond Regional Medical Center Intensive Care Unit ("ICU") for 11 days for complications resulting from her septic shock.

150.   On July 13, 2016, Ms. Golden was transferred to University of Alabama-Birmingham Medical Center in Birmingham, Alabama for further management of ARDS and other complications due to her septic illness.

151.   As a result of her septic shock and multiple organ failure, Ms. Golden developed necrosis requiring multiple amputations of parts of her fingers and toes.

152.   Defendants Floyd Emergency, Dr. Barnes, NP Stein, and PA Rogers failed to timely order an appropriate transfer of Ms. Golden to Floyd Medical Center's Intensive Care Unit where she could have received immediate and proper diagnostic testing and evaluation, medical treatment, resuscitation, and specialized care and treatment for her then obviously dire condition.

153.   The negligent and grossly negligent acts and omissions of Defendants Floyd Healthcare, Floyd Emergency, Dr. Barnes, NP Stein, and PA Rogers proximately caused or contributed to Ms. Golden's permanent injuries.

154.   As a direct and proximate result of the Defendants' wrongful acts and omissions, among other things, the Plaintiff Ms. Golden:

(a)    suffered toxic septic shock, multiple organ failure, and ultimately necrosis, requiring the preventable amputation of parts of multiple fingers on each of her hands and parts of multiple toes on each of her feet;

(b)    sustained past serious injuries, and will in the future sustain further serious personal injuries, many of which are permanent and catastrophic;

(c)     suffered in the past, and will suffer in the future, serious physical and

mental pain and suffering, much of which is permanent;

(d)     has been prevented from transacting her business in the past, and will

continue to be prevented from transacting her business in the future;

(e)     has suffered a diminished capacity to enjoy life, and will continue to do

in the future, most of which is permanent;

(f)     has sustained a diminished earning capacity, and will continue to do in

the future, most of which is permanent;

(g)     has incurred expenses for medical and other care, treatment, goods, and

services in the past in excess of $75,000.00 and continue to incur such

expenses in the future; and

(h)     will in the future sustain and incur other special damages the nature and

extent of which is not yet determined.

155.   The Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers have acted in bad faith in the underlying transactions and occurrences forming the basis of this complaint and are subject to liability to the Plaintiff Ms. Golden for her reasonable attorney's fees and litigation expenses as a part of her damages under O.C.G.A. § 13-6-11.

## COUNT 1
## CLAIM FOR MEDICAL AND HOSPITAL NEGLIGENCE

156.   Paragraphs 1 through 155 are incorporated by reference.

157.   By reason of the foregoing, the Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers are subject to liability to the Plaintiff Ms. Golden for all her damages resulting from her injuries.

WHEREFORE, PLAINTIFF DEMANDS trial by jury and judgment against the Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers for such sums in excess of $75,000 as compensatory damages as the evidence shows she is justly entitled to recover, together with interest, attorney's fees and litigation expenses, if applicable, and all costs of this action.

## COUNT 2
## ABANDONMENT

158.   Paragraphs 1 through 155 are incorporated by reference.

159.   By reason of the foregoing the Defendants Floyd Healthcare, Dr. Barnes, NP Stein, and PA Rogers are subject to liability to Plaintiff Ms. Golden for all her damages resulting from her injuries proximately caused by their abandonment of her as a patient of Floyd Medical Center's Emergency Department without providing a reasonable substitute health care provider or reasonable notice to enable her to employ other physician and healthcare facilities.

WHEREFORE, PLAINTIFF DEMANDS trial by jury and judgment against the Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers for such sums in excess of $75,000 as compensatory damages as the evidence shows she is justly entitled to recover, together with interest, attorney's fees and litigation expenses, if applicable, and all costs of this action.

## COUNT 3
## CLAIM FOR EMTALA VIOLATIONS

160.   Paragraphs 1 through 155 and 159 are incorporated by reference.

161.   On July 1, 2016, when Plaintiff Ms. Golden presented to the Floyd Medical Center Emergency Department, and at all relevant times thereafter, the she had an "emergency medical condition" within the meaning of the EMTALA Law.

162.   After Ms. Golden presented at the Floyd Medical Center Emergency Department for examination and treatment, Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers failed to conduct an appropriate examination to assess the Plaintiff's condition and determine whether she had an "emergency medical condition" within the meaning of the EMTALA Law.

163.   Thereafter, Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers failed to provide Ms. Golden with either:

(a)   such further medical examination and such treatment as was available within the staff and facilities at Floyd Medical Center Emergency

Department and was required to stabilize the Plaintiff's emergency medical condition, or

(b)     for an "appropriate transfer" of the Plaintiff to another medical facility within the meaning the of the EMTALA Law.

164.  On July 1, 2016, defendants "transferred" the Plaintiff within the meaning of the EMTALA Law by discharging her at a time she had an undiagnosed and untreated emergency medical condition which had not been "stabilized" within the meaning of the EMTALA Law, in violation of the EMTALA Law.

165.  Each of these acts and omissions by Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers is a violation of the EMTALA Law.

166.  These violations of the EMTALA Law proximately caused or contributed to the Plaintiff's injuries describe in ¶¶ 154 and 155 above.

167.  By reason of the foregoing, Plaintiff Ms. Golden is entitled to recover all her damages resulting from her injuries from the Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers for their violations of the EMTALA Law.

WHEREFORE, PLAINTIFF DEMANDS trial by jury and judgment against the Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA

Rogers for such sums in excess of $75,000 as compensatory damages as the evidence shows she is justly entitled to recover, together with interest, if applicable, and all costs of this action.

COUNT 4
CLAIM FOR ASSUMPTION OF LIABILITIES

168.  Paragraphs 1 through 155, 159, and 161-167 are incorporated by reference.

169.   On information and belief, by reason of directly or indirectly assuming the liabilities of Floyd Emergency, Defendant Etowah Emergency is subject to liability to Plaintiff Ms. Golden for all damages she is entitled to recover against Defendants Floyd Healthcare, Floyd Emergency, Barnes, NP Stein, and PA Rogers.

170.   WHEREFORE, PLAINTIFF DEMANDS trial by jury and judgment against the Defendant Etowah Emergency for such sums in excess of $75,000 as compensatory damages as the evidence shows she is justly entitled to recover, together with interest, if applicable, and all costs of this action.

Attorneys for Plaintiff:

**COOK & CONNELLY, LLC**
By: *s/Bobby Lee Cook*
Bobby Lee Cook
Georgia State Bar No.: 183100

By: **s/Christopher Sutton Connelly**

Christopher Sutton Connelly
Georgia State Bar No. 940353

9899 Commerce Street
P. O. Box 370
Summerville, Georgia 30747
TEL   706/857-3421
FAX  706/857-1520
Cook Email:       blcook@cookconnelly.com
Connelly Email:  sutton.connelly@cookconnelly.com

**THE STONE LAW GROUP –
TRIAL LAWYERS, LLC**

By: **s/William S. Stone**

William S. Stone
Georgia State Bar No. 684636

P. O. Drawer 70
589 College Street
Blakely, Georgia 39823
TEL   229/723-3045
FAX  229/723-4834
W. Stone email:  billstone@stonelaw.com

By: **s/Michael G. Regas, II**

Michael G. Regas, II
Georgia State Bar No. 599084

By: **s/Ryals D. Stone**

Ryals D. Stone
Georgia State Bar No. 831761

5229 Roswell Road. NE
Atlanta, GA 30342
TEL   404/239-0305
FAX  404/445-8003
M. Regas email:  mike@stonelaw.com
R. Stone email:   ryals@stonelaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| JAMI LYNN GOLDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION FILE NO. _____ |
| | * | |
| FLOYD HEALTHCARE | * | |
| MANAGEMENT, INC. d/b/a | * | |
| FLOYD MEDICAL CENTER, | * | |
| FLOYD EMERGENCY | * | |
| PHYSICIANS, LLC a/k/a FLOYD | * | |
| EMERGENCY PHYSICIANS | * | |
| GROUP, LLC, GARRETT H. | * | |
| BARNES, M.D., CHARLES W. | * | |
| STEIN, N.P., DANNY R. ROGERS, | * | |
| P.A., and ETOWAH EMERGENCY | * | |
| PHYSICIANS, LLC. | * | |
| | * | |
| Defendants. | * | |

## AFFIDAVIT OF LOUIS P CIAMILLO, JR., M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

JAMI LYNN GOLDEN,                              *

      Plaintiff,                              *

v.                                              *      CIVIL ACTION FILE NO. _____

FLOYD HEALTHCARE                                *
MANAGEMENT, INC. d/b/a
FLOYD MEDICAL CENTER,                           *
ETOWAH EMERGENCY
PHYSICIANS, LLC, a/k/a FLOYD                    *
EMERGENCY PHYSICIANS LLC,
a/k/a FLOYD EMERGENCY                           *
PHYSICIAN GROUP LLC,
GARRETT H. BARNES, M.D.,                       *
CHARLES W. STEIN, N.P., and
DANNY R. ROGERS, P.A.,                          *

      Defendants.                             *

**AFFIDAVIT OF LOUIS P. CIAMILLO, JR., M.D.**

STATE OF GEORGIA
COUNTY OF RICHMOND

    Personally appeared before me, the undersigned officer duly authorized to administer oaths, Louis P. Ciamillo Jr., M.D. who, being first duly sworn, deposes and says as follows:

    1. I am Louis P Ciamillo Jr, MD. I am of age of majority and suffer under no disabilities that would preclude me from giving this affidavit or giving testimony in this matter. All of the opinion testimony given by me is within my personal knowledge and is based on my review of the medical records described herein.

    2. All the opinions I express in this affidavit have been formed and are expressed by me to a reasonable degree of medical certainty and probability.

    3. At all times herein relevant, including the time of the occurrence of the negligent acts and or opinions discussed below:

    (a) I am and have been a medical doctor duly licensed to practice medicine in the state of Georgia;

    (b) I am board-certified in the field of emergency medicine;

    (c) I have been practicing emergency medicine continuously for 17 years from 2001 to the present;

    (d) As a result of my education, training, and experience in the field of emergency medicine, I have professional knowledge of the applicable standard of care possessed and used by board certified physicians practicing in that field in conditions and circumstances similar to or

lime those existing in Jami Lynn Golden's case;

(e) I have trained and taught principles of emergency medicine to medical students and resident physicians.

(f) I have trained, supervised, and instructed mid-level healthcare providers including nurses, technicians, physician assistants, nurse practitioners, and other medical support staff in the proper provision of emergency medical services; and

(g) As a result of my education, training, and experience in the field of emergency medicine, I have professional knowledge of the applicable standard of care possessed and used by mid-level healthcare providers including nurses, technicians, physician assistants, nurse practitioners, and other medical support staff in the proper provision of emergency medical services in conditions and circumstances similar to or lime those existing in Jami Lynn Golden's case.

4. My current CV is attached hereto.

5. I have been requested by Ms. Golden's attorneys, THE STONE LAW GROUP- TRIAL LAWYERS, LLC, to review Ms. Golden's applicable medical records, to determine whether the care she received on July 1-2, 2016 by the healthcare providers in the Floyd Medical Center Emergency Department complied with the applicable standard of care that must be possessed and used by such healthcare providers under the same or similar circumstances and conditions presented by Ms. Golden's case.

6. I have also been requested to provide testimony concerning my opinions on whether failure to comply with such standards of care by the healthcare providers in the Floyd Medical Center Emergency Department caused any injury to Ms. Golden. I agreed to do so, but only if independently I formed any opinion to a reasonable degree of medical certainty or probability that Ms. Golden sustained an injury caused by the failure of one or more of such health care providers to comply with the applicable standard of care.

7. I have reviewed the emergency department medical records from Redmond Medical Center DOS June 22, 2016, Floyd Medical Center DOS July 1 – 2, 2016, and Redmond Regional Medical Center DOS July 2 – 13, 2016, pertaining to the care, treatment and services rendered to Ms. Golden by the medical, nursing, and technical and support staff personnel in the emergency department involved in the incident forming the basis of this case.

8. I have assumed for the purposes of this affidavit that these medical records accurately reflect the course of care, treatment and services rendered to Ms. Golden, and that the facts that are recorded therein are recorded correctly. The following facts appear in these medical records, and are noted only in that they provide a brief overview of the care, treatment and services rendered. They are not intended to be in any way comprehensive or all encompassing, nor do they recite the entirety of the records.

9. On June 22, 2016, Ms. Golden, a twenty-two (22) year old female, presented to the Redmond Regional Medical Center Emergency Department with a chief complaint of abdominal pain and right lower quadrant pain lasting for several weeks.

10. In the Redmond Regional Medical Center Emergency Department, Ms. Golden had initial vital signs including a temperature of 98.5 degrees Fahrenheit, a pulse of 71 bpm, respirations of 18 per minute, pulse oxygenation of 99% and a blood pressure of 131/85. Her physical exam revealed right lower quadrant abdominal tenderness. Her care provider in the Redmond Emergency Department was Christina Crane, Nurse Practitioner. Labs were ordered, including a complete blood count, basic metabolic panel, urinalysis and pregnancy test. The complete blood count revealed a white blood cell count of 7.1 and was otherwise unremarkable. The basic metabolic panel was within normal limits for all tests. Urinalysis was negative for infection, and a urine pregnancy test was negative. Despite the patient's normal vital signs and normal labs, a CT scan was ordered

due to her reproducible abdominal tenderness. In my opinion this was an appropriate study. The CT scan proved negative for any acute process, and the Ms. Golden with normal vital signs was discharged home with a referral to GYN and instructed to take Naprosyn for pain. Appropriate follow-up was provided and return precautions were given. In my opinion, the care provided by Christina Crane, NP met the standard of care given Ms. Golden's documented history and physical exam and the negative initial work up.

11. On July 1, 2016, Ms. Golden presented to the Floyd Medical Center Emergency Department with a chief complaint of worsening abdominal pain, chills, nausea, and vomiting. She was admitted to the Emergency Department under the care of Garrett H. Barnes, M.D. as her attending physician.

12. Upon presentation to the Floyd Medical Center Emergency Department, Ms. Golden had initial vital signs including a temperature of 99.5 degrees Fahrenheit (low grade fever), a heart rate of 118 bpm, blood pressure of 111/64 and pulse oxygenation of 99%, with a respiratory rate of 20/min. Upon presentation to the Floyd Emergency Department, Ms. Golden met 1 criterion of Systemic Inflammatory Response Syndrome ("SIRS") – her pulse was greater than 90 (Ms. Golden's pulse was 118).

13. A patient must meet 2 SIRS criteria plus have a concerning source for infection to meet Sepsis Threshold. Ms. Golden's initial mid-level care provider at Floyd Medical Center Emergency Department was Charles W. Stein, Nurse Practitioner (NP). Given Ms. Golden's complaint of "9 out of 10" abdominal pain, NP Stein ordered the following work-up: a complete blood count with differential, comprehensive metabolic panel, lipase, urine pregnancy test, and a pelvic ultrasound. The results of these tests were significant for a white blood count of 4.9 and Bands of 15%; Bands of greater than 10% are highly suggestive of an infection and qualify as a SIRS criterion. Ms. Golden now met 2 SIRS criterion. Ms. Golden's other labs indicated an Hg of 11.6, Hct of 38% and Platelets of 135; these are all acceptable values. Ms. Golden's urinalysis revealed small bilirubin, ketones of 40 (indicative of dehydration), specific gravity of greater than 1.030 (highly concentrated, also indicative of dehydration), large blood, 30 Protein, and Trace Leukocyte esterase. Ms. Golden's comprehensive metabolic panel revealed potassium of 3.3 (low, likely secondary to vomiting), and elevated liver enzymes ALT 141, ALT 212, and Lipase 212 (wnl). Ms. Golden's pelvic ultrasound revealed no acute process. No serum lactate was ordered.

14. The review of systems documented by NP Stein included nausea and vomiting but stated there was no abdominal pain, only vaginal pain. NP Stein was unable to complete a speculum exam due to pain per his records. However, NP Stein did do a bimanual exam which revealed right lower quadrant tenderness, or more specifically, right adnexal tenderness. Ms. Golden initially reported "9 out of 10" abdominal pain, and while in the Floyd Medical Center Emergency Department Ms. Golden was given 4 mg of morphine, two doses of Zofran 4mg, and 1 dose of Phenergan 12.5mg for nausea. Ms. Golden was also given 1 liter of normal saline fluid resuscitation. Abdominal pain does show up in the documentation by NP Stein in the medical decision-making section of the chart. I am concerned that two other diagnoses seem to also have been entertained: (1) ovarian cyst, and (2) endometriosis, neither of which is traditionally associated with a fever or bandemia.

15. At 12:00 a.m., the end of his shift, on July 2, 2016, NP Stein turned over Ms. Golden to Danny R. Rogers, Physician's Assistant (PA) to take over her care. It appears that the only study that had not returned at the time NP Stein handed Ms. Golden off to PA Rogers was the ultrasound of her pelvis. I assume, given Ms. Golden's labs had already been reported, that NP Stein had reviewed Ms. Golden's labs prior to handing her off to PA Rogers. In my opinion this patient hand off was binary. If the pelvic ultrasound is negative, Ms. Golden is to be sent home, if positive appropriate management is expected. Although the pelvic ultrasound did not reveal an acute process, it did reveal the presence of ovarian cysts, which were not concerning for acute disease and thought to be physiologic.

because he made an entry in the medical records at 3:02 a.m. on July 2, 2016 stating that "Interpretation labs unremarkable."

17. In my opinion, NP Stein and PA Rogers failed to comply with the applicable standard of care for nurse practitioners and physicians assistants providing emergency department care. NP Stein and PA Rogers failed to recognize Ms. Golden's septic condition. Ms. Golden met appropriate criteria for a significant concern for the presence of sepsis. Because Ms. Golden had originally presented to the Floyd Emergency Department with a pulse greater than 90, bands of 15%, and the presence of abdominal pain which was not differentiated with the pelvic ultrasound study ordered, I believe that the standard of care required further work up of Ms. Golden, which was not done and that was a breach in the standard of care.

18. On July 2, 2016 at approximately 2:03 a.m., there is a nursing assessment that activates a sepsis notification prior to discharge due to a bandemia of 15%, a pulse of 100, and now a new change in vital sign – a low systolic blood pressure of 88mm/hg. Despite this overwhelming medical record evidence of sepsis, PA Rogers discharged Ms. Golden without further work up or resuscitation at 3:02 a.m. on July 2, 2016. At time of discharge there clearly were several indicators of a more serious condition that were ignored by Ms. Golden's mid-level providers, NP Stein and PA Rogers. In my opinion this breach on the standard of care was gross negligence.

19. On July 2, 2016, at approximately 2:03 a.m., Ms. Golden was discharged from the Floyd Medical Center Emergency Department by her mid-level provider Danny Rogers, P.A. with a low blood pressure of 88/55mm/Hg, a heart rate of 100 bpm, respiratory rate of 17, and a temperature of 98°F. Clearly, the presence of hypotension added to the clinical picture which, despite fluid resuscitation, should have been the impetus for admission and additional evaluation and resuscitation. Despite her concerning vital signs, Ms. Golden was discharged from the Floyd Medical Center Emergency Department by her mid-level provider PA Rogers with a prescription for pain meds and recommended follow up in 2-3 days. In my opinion, no reasonable practitioner would have discharged this patient in this clinical state, and by doing so PA Rogers breached the standard of care.

20. Both NP Stein and PA Rogers were required to practice under the supervision of a licensed physician.

21. From her presentation to the Floyd Medical Center Emergency Department at 8:24 p.m. on July 1, 2016 her discharge at approximately 3:02 a.m. on July 2, 2016, Dr. Barnes was the attending physician and supervising physician of record in the Floyd Medical Center Emergency Department.

22. Under the circumstances and conditions presented in Ms. Golden's case, the standard of care required NP Stein and PA Rogers to notify the supervising physician of Ms. Golden's symptoms, medical condition, vital signs, and her diagnostic test results, and seek his guidance before discharging her from the Emergency Department.

23. In my thorough review of Ms. Golden's Floyd Medical Center Emergency Department medical records I was unable to find any evidence that NP Stein or PA Rogers ever notified Dr. Barnes of Ms. Golden's presentation to the Emergency Department, her symptoms, medical condition, vital signs, or of any of her diagnostic test results before discharging her from the Emergency Department.

24. If these mid-level providers who undertook to manage Ms. Golden's care failed to notify Dr. Barnes of Ms. Golden's symptoms, medical condition, vital signs, and diagnostic test results prior to discharging her from the Emergency Department, such failure was a breach in the standard of care and was gross negligence.

25. Dr. Barnes signed Ms. Golden's Floyd Medical Center Emergency

Case 4:18-mi-98959-UNA Document 43 Filed 06/29/18 Page 46 of 59

26. On the other hand, if evidence develops in discovery in this case that shows Dr. Barnes was in fact notified by either NP Stein or PA Rogers of Ms. Golden's symptoms, medical condition, vital signs, and diagnostic test results at any time prior to Ms. Golden's discharge from the Floyd Emergency Department, Dr. Barnes would have a duty to respond personally to examine and treat Ms. Golden appropriately based on her symptoms, medical condition, vital signs, and diagnostic test results prior to her discharge. My opinion if such evidence is discovered is that a failure by Dr. Barnes as supervising Emergency Department physician to respond personally and examine and treat Ms. Golden appropriately based on her symptoms, medical condition, vital signs, and diagnostic test results before discharging her would be a breach in the standard of care and gross negligence on his part.

27. On July 2, 2016 upon her discharge from the Floyd Medical Center Emergency Department, Ms. Golden was immediately transported back to her summer residence at nearby Camp WinShape at Berry College in Rome, Georgia where Ms. Golden was employed as a camp counselor during the summer of 2016. Over the next several hours, Ms. Golden continued to complain of abdominal pain, nausea, and vomiting, and she had at least one episode of loose watery diarrhea earlier that same day. She also complained of a sore throat, progressive shortness of breath, and headache. Ms. Golden became rapidly worse such that she could not stand without vomiting, and she became dizzy and near syncopal.

28. On July 2, 2016, at approximately 4:00 p.m., less than fourteen (14) hours after she had been prematurely discharged from the Floyd Medical Center Emergency Department, Ms. Golden again had to be transported to the nearby Redmond Regional Medical Center Emergency Department by EMS in extremis. Ms. Golden presented to the Redmond Emergency Department in full-blown septic shock, exhibiting signs of multiple organ failure, hypotension, and shortness of breath. Upon her presentation at Redmond Emergency Department, Ms. Golden was alert but diaphoretic, cyanotic, and she had complaints of chest pain as well as shortness of breath and abdominal pain. In the Redmond Emergency Department, Ms. Golden was cared for by Sarah Mack, M.D.

29. On July 2, 2016, upon her presentation to the Redmond Regional Medical Center Emergency Department at approximately 4:00 p.m., Ms. Golden's vital signs were taken; her blood pressure was 48/29, and her pulse was 142 bpm with strong evidence of sepsis present. Sepsis protocol was initiated immediately upon Ms. Golden's arrival at the Redmond Emergency Department. Ms. Golden was administered IV fluids for hypotension; throughout the course of her emergency admission to Redmond, Ms. Golden became progressively short of breath, persistently hypotensive, and she required intubation. Once Ms. Golden's airway was secured, a central line was placed in her right internal jugular vein. Ms. Golden was given 0.9% Normal Saline and was started on vasopressors for persistent hypotension. A chest x-ray was ordered and revealed bilateral infiltrates suggestive of Acute Respiratory Distress Syndrome (ARDS). Her white blood cell count was 15,000, her lactic acid was 5.5, BUN 34; her creatinine measured at 3.5 (indicative of acute renal failure). Ms. Golden's AST and ALT were both elevated, and pH of her blood was 7.21 (indicative of acidosis). In my opinion, the caregiving by the Redmond emergency physician and staff was excellent and met the standard of care.

30. On July 2, 2016 upon her presentation to the Redmond Regional Medical Center Emergency Department at approximately 4:00 p.m., Ms. Golden was subsequently admitted to the Redmond Regional Medical Center Intensive Care Unit (ICU) for the next eleven (11) days for complications associated with septic shock.

31. On July 13, 2016 Ms. Golden was transferred to University of

Case 4:18-mc-00059-ONE  Document 73  Filed 06/30/18  Page 47 of 59
management of Acute Respiratory Distress Syndrome ("ARDS") and other complications due to her illness.

32. It is my professional opinion within a reasonable degree of medical certainty and probability that the standard of care for nurse practitioners and physician's assistants participating in the emergency department care of a septic patient such as Ms. Golden (who prior to being discharged exhibited at least 2 criteria for SIRS, a low grade fever, 9 out of 10 abdominal pain, bandemia of 15%, blood pressure of 88/55mm/Hg, a heart rate of 100 bpm, respiratory rate of 17, persistent tachycardia and new hypotension, and urinalysis results indicating dehydration) requires that the patient be seen by a physician, treated with immediate administration of broad-spectrum antibiotics, transferred to the intensive care unit, with possible source control surgical intervention.

33. Based upon my review of the medical records in Ms. Golden's case, my education, training and experience, and familiarity with the standard of care, it is my professional opinion, to a reasonable degree of medical certainty and probability, that the care and treatment rendered by the mid-level providers NP Stein, PA Rogers managing Ms. Golden's care in the Floyd Medical Center Emergency Department fell below the minimum standard of care and treatment required by nurse practitioners and physician's assistants generally under similar conditions and like surrounding circumstances, and was gross negligence.

34. Specifically, the care rendered by mid-level providers NP Stein and PA Rogers, assuming they neither informed nor sought guidance from their supervising emergency physician Dr. Barnes concerning Ms. Golden's dire septic condition prior to discharging her from the Floyd Medical Center Emergency Department, fell below the minimum standard of knowledge, care, skill and treatment required of emergency department nurse practitioners and physicians assistants generally under similar conditions and like surrounding circumstances in at least the following respect: (1) NP Stein and PA Rogers failed to recognize Ms. Golden, as a sepsis patient whose vital signs and diagnostic test results met at least 2 criteria for SIRS (i.e., abdominal sepsis) prior to discharging her. (2) They failed to diagnose, locate, manage, or treat the source of Ms. Golden's abdominal infection. (3) They apparently failed to inform or seek any guidance or instruction from or intervention by their supervising emergency physician Dr. Barnes prior to discharging Ms. Golden who clearly was a septic patient.

35. Based upon my review of the above-referenced materials, my education, training, and experience, and familiarity with the standard of care, it is my professional opinion, to a reasonable degree of medical certainty and probability, that the care and treatment rendered by NP Stein fell below the minimum standard of care and treatment required by nurse practitioners generally under similar conditions and like surrounding circumstances.

36. Based upon my review of the above-referenced materials, my education, training, and experience, and familiarity with the standard of care, it is my professional opinion, to a reasonable degree of medical certainty and probability, that the care and treatment rendered by PA Rogers fell below the minimum standard of care and treatment required by physician's assistants generally under similar conditions and like surrounding circumstances.

37. It is my opinion that this deviation below the standard of care by the mid-level providers NP Stein and PA Rogers managing Ms. Golden's care in the Floyd Medical Center Emergency Department proximately caused or contributed to Ms. Golden's injuries including septic shock, multiple organ failure, and ultimately necrosis requiring subsequent partial amputations of several of Ms. Golden's fingers and toes.

38. It is also my opinion that the complete lack of medical care rendered by Dr. Barnes, if in fact he was informed of Ms. Golden's dire septic condition prior to her discharge from the Floyd Medical Center Emergency Department, fell below the minimum standard of knowledge, care, skill and treatment required of emergency physicians generally under similar conditions and like surrounding

circumstances in at least the following respects: (1) Dr. Barnes failed to respond personally to Ms. Golden, a clearly septic patient exhibiting at least 2 criteria for SIRS. (2) Dr. Barnes failed to admit Ms. Golden to Floyd's Intensive Care Unit in order to appropriately locate the source of, diagnose, and treat her apparent abdominal infection, as well as adequately manage, monitor, and relieve Ms. Golden's tachycardia, hypotension, and dehydration by administering appropriate and timely antibiotics and fluids.

39. Likewise, it is my opinion that if Dr. Barnes, the supervising emergency physician, was informed of Ms. Golden's medical condition in the Floyd Emergency Department prior to her discharge from the Floyd Medical Center Emergency Department but failed to appropriately respond personally to and treat Ms. Golden, this deviation below the standard of care by Dr. Garrett Barnes proximately caused or contributed to Ms. Golden's injuries including septic shock, multiple organ failure, and ultimately necrosis requiring subsequent partial amputations of several of Ms. Golden's fingers and toes.

40. This affidavit is given to comply with the requirements of O.C.G.A. § 9-11-9.1 and to oppose any motion for summary judgment that may be filed in this matter. This affidavit is neither a summary of all opinions that I may hold in this matter nor a listing of each and every material departure from the standard of care. I reserve the right to revise my opinions, and to form and express additional opinions after reviewing additional evidence that as yet is unavailable to me.

41. I understand that this affidavit will be used with respect to the filing of a civil action on behalf of Ms. Golden.

FURTHER AFFIANT SAYETH NOT.

Louis P. Ciamillo Jr., M.D.

Sworn to and submitted
Before me this 2 7 day
of June , 2018

Notary Public

My commission expires
10/18/2021 .

(NOTARY SEAL)

2

# CURRICULUM VITAE

March 2018

## Louis Preston Ciamillo, Jr., MD

Associate Professor
Department of Emergency Medicine
Medical College of Georgia

**HOME ADDRESS:**    1587 River Island Parkway
Evans, GA  30809
Phone: (706) 533-2911

**OFFICE ADDRESS:**    Augusta University Medical Center
Department of Emergency Medicine
1120 15th Street, AF-2037
Office:  (706) 721-9957
Fax:  (706) 721-7718
Cell:  (706) 533-2911

**CERTIFICATION:**    American Board of Emergency Medicine
November 2005 - Present

**EDUCATION:**

2000 – 2003        Emergency Medicine Residency
Medical College of Georgia
Augusta, Georgia

1999 – 2000        Internal Medicine Internship
Medical College of Georgia
Augusta, Georgia

1995 – 1999        M.D., Doctorate of Medicine
Medical College of Georgia
Augusta, Georgia

1992 - 1995        B.S., Bachelor's of Science Biology
Augusta State University
Augusta, Georgia

# CURRICULUM VITAE

**PROFESSIONAL:**

| | |
|---|---|
| 2016–Present | Director of Quality Assurance<br>Medical College of Georgia at Augusta University Medical Center<br>Augusta, Georgia |
| 2004 – 2016 | Medical Director of Emergency Medicine<br>Medical College of Georgia<br>Augusta, Georgia |
| 2011 – Present | Associate Professor of Emergency Medicine<br>Medical College of Georgia at Augusta University Medical Center<br>Augusta, Georgia |
| 2008 – 2012 | Service Chief of Emergency Medicine<br>Georgia Health Sciences University<br>Augusta, Georgia |
| 2003 – 2011 | Assistant Professor of Emergency Medicine<br>Medical College of Georgia<br>Augusta, Georgia |
| 2003 – 2004 | Assistant Program Director of Emergency Medicine Residency<br>Medical College of Georgia<br>Augusta, Georgia |
| 2003 – 2004 | Program Director of Physician Assistant Emergency Medicine Residency<br>Medical College of Georgia<br>Augusta, Georgia |
| 2002 – 2004 | Staff Physician in Emergency Medicine<br>Wills Memorial Hospital<br>Washington, Georgia |
| 2001 – 2002 | Staff Code Call Physician<br>Phyamerica<br>Augusta, Georgia |
| 2001 – 2002 | Staff Emergency Medicine Physician<br>Emanuel Medical Center<br>Swainsboro, Georgia |

## CURRICULUM VITAE

| | |
|---|---|
| 2001 – 2003 | Staff Emergency Medicine Physician<br>Burke Medical Center<br>Waynesboro, Georgia |
| 1988 – 1992 | Comptroller/Owner<br>MGW Limited<br>Frederick, Maryland |

**COMMITTEES:**

| | |
|---|---|
| 2011 – 2016 | Quality Unit Council Committee, Department of Emergency Medicine<br>Medical College of Georgia/Georgia Health Sciences University<br>Augusta, Georgia |
| 2008 - 2016 | Medical Executive Committee<br>MCG Health Inc.<br>Augusta, Georgia |
| 2008 - 2016 | Leadership Committee, Department of Emergency Medicine<br>Medical College of Georgia/Georgia Health Sciences University<br>Augusta, Georgia |
| 2008 – 2016 | Patient Advisor Committee Meeting<br>Medical College of Georgia/Georgia Health Sciences University<br>Augusta, Georgia |
| 2006 – Present | ICU Committee<br>MCG Health Inc.<br>Augusta, Georgia |
| 2006 - Present | Academic Group Practice Committee<br>Medical College of Georgia/Georgia Health Sciences University<br>Augusta, Georgia |

**MEMBERSHIPS/BOARD CERTIFICATION:**

| | |
|---|---|
| 2005-Present | Board Certification American Board of Emergency Medicine (Recertification 2015 For 10 year term) |
| 2004-Present | Member American Academy of Emergency Medicine |
| 2004-Present | Member American College of Emergency Physicians |
| 2004-2006 | Member American Medical Association (discontinued membership due political beliefs.) |
| 1991-Present | Lifetime Membership Award Phi Kappa Phi Honor Society |

# CURRICULUM VITAE

**AWARDS:**

1988    Thomas W. Pangborn Scholarship (Academic Scholarship Mount Saint Mary's College)
1991    McCrary Science Award (Institutional Science Award, Augusta University, given each year to most outstanding student in Science)
1991    Phi Kappa Phi Essay – Semi-Finalist in national PKP essay contest (Lifetime Membership in PKP Honor Society awarded)
1995    James Puryear Scholarship (Medical College of Georgia Academic Scholarship)
1999    Emergency Medicine Resident Teacher of the Year

**PRESENTATIONS:**

October, 2017
                       "Anaphylaxis/Allergic Rxn/Angioedema"
                       Augusta University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

May, 2015         "Eye Emergencies"
                       Georgia Regents University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

May, 2015         "Neurology"
                       Georgia Regents University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

February, 2015    "Board Review"
                       Georgia Regents University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

June, 2014        "Pacing Lab"
                       Georgia Regents University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

February 2014     "Pneumonia Review"
                       Georgia Regents University Emergency Medicine Grand Rounds
                       Augusta, Georgia
                       Presentation

# CURRICULUM VITAE

| | |
|---|---|
| February 2014 | "Ortho Review"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| November 2013 | "Hypothermia Protocol"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |

**PRESENTATIONS CONTINUED…**

| | |
|---|---|
| September 2013 | "Eye Emergencies"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| June 2013 | "Pacing Lab"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| February 2013 | "Ortho Review"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| February 2013 | "Pneumonia Review"<br>Georgia Regents University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| May 2012 | "Live Tissue Lab/Transvenous Cardiac Pacing"<br>Georgia Health Sciences University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| February 2012 | "Pulmonary In-Service Review"<br>Georgia Health Sciences University Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| March 2011 | "Live Tissue Lab/Transvenous Cardiac Pacing"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia |

# CURRICULUM VITAE

Presentation

April 2010          "Live Tissue Lab/Transvenous Cardiac Pacing"
                    Medical College of Georgia Emergency Medicine Grand Rounds
                    Augusta, Georgia
                    Presentation

## PRESENTATIONS CONTINUED…

December 2009       "Orthopedics"
                    Medical College of Georgia Emergency Medicine Grand Rounds
                    Augusta, Georgia
                    Presentation

September 2009      "Medical College of Georgia Emergency Medicine Faculty Retreat"
                    Augusta, Georgia
                    Retreat Director

June 2009           "Care of the Psychiatric Patient in Georgia"
                    Georgia College of Emergency Physicians Annual Assembly
                    Hilton Head, SC
                    Presentation

June 2009           "Live Tissue Lab/Cardiac Pacing"
                    Medical College of Georgia Emergency Medicine Grand Rounds
                    Augusta, Georgia
                    Presentation

September 2008      "M & M"
                    Medical College of Georgia Emergency Medicine Grand Rounds
                    Augusta, Georgia
                    Presentation

August 2008         "Medical College of Georgia Emergency Medicine Faculty Retreat"
                    Augusta, Georgia
                    Retreat Director

February 2008       "Pulmonary Emergencies"
                    Medical College of Georgia Emergency Medicine Grand Rounds
                    Augusta, Georgia
                    Presentation

# CURRICULUM VITAE

January 2008          "Journal Club"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation


November 2007         "Pericarditis, Endocarditis, Myocarditis
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation

**PRESENTATIONS CONTINUED…**

August 2007           "Medical College of Georgia Emergency Medicine Faculty Retreat"
                      Augusta, Georgia
                      Retreat Director


July 2007             "Transvenous Pacing Lab"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Live Animal Lab


July 2007             "Emergency Airway Technique Fiberoptic"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation


June 2007             "Cardiac Pacing"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Live Animal Lab


April 2007            "Difficult Airways"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation


February 2007         "Ortho Review"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation


February 2007         "Pulmonary Review"
                      Medical College of Georgia Emergency Medicine Grand Rounds
                      Augusta, Georgia
                      Presentation

# CURRICULUM VITAE

| | |
|---|---|
| January 2007 | "Journal Club"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| August 2006 | "Medical College of Georgia Emergency Medicine Faculty Retreat"<br>Augusta, Georgia<br>Retreat Director |

**PRESENTATIONS CONTINUED...**

| | |
|---|---|
| August 2006 | "Diabetic Keto Acidosis"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| August 2006 | "Transvenous Cardiac Pacing"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| February 2006 | "Pulmonary Review"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| August 2005 | "Diabetic Keto Acidosis"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| April 2005 | "EM Administration"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| February 2005 | "Pulmonary Review"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia<br>Presentation |
| January 2005 | "Acute Renal Failure"<br>Medical College of Georgia Emergency Medicine Grand Rounds<br>Augusta, Georgia |

Case 4:18-cv-99959-UNA   Document 78   Filed 06/30/18   Page 57 of 59

# CURRICULUM VITAE

Presentation

January 2005    "Medical Screening Exam"
               Medical College of Georgia Emergency Medicine Grand Rounds
               Augusta, Georgia
               Presentation

# CURRICULUM VITAE

**PRESENTATIONS CONTINUED…**

September 2004    "Pericarditis, Endocarditis, Myocarditis"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

May 2004          "Journal Club"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

April 2004        "Resuscitation"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

March 2004        "Diabetic Keto Acidosis"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

February 2004     "Pulmonary Review"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

January 2004      "Acute Renal Failure"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

November 2003     "Pneumonia"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

August 2003       "Resuscitation"
                  Medical College of Georgia Emergency Medicine Grand Rounds
                  Augusta, Georgia
                  Presentation

# CURRICULUM VITAE

**PRESENTATIONS CONTINUED…**

July 2003          "Ortho/Splinting"
                        Medical College of Georgia Emergency Medicine Grand Rounds
                        Augusta, Georgia
                        Presentation

**ADMINISTRATIVE PROJECTS:**

May 2007 - July 2010          Emergency Room Expansion

                        Approached MCG Health Inc about expansion of the current ED to include a
                        10 bed acute care unit and 7 bed psychiatric unit. From inception to bond
                        issue to architect and patient advisory meetings, the entire process took four
                        years.  The 6.5 million dollar project was my initiative and both new units
                        opened in July 2010. The psychiatric unit was a novel approach to the
                        management of patients with behavioral health emergencies and we
                        successfully opened the unit with co-management buy in from the Medical
                        College of Georgia's Department of Psychiatry.

January 2006 - 2016          Billing and Coding Chart Review

                        Devised a system for coding clerks to communicate with emergency
                        physicians in our practice group regarding missed documentation.  Process
                        closed a $500,000 gap in procedures done but not documented. Process also
                        improved our group critical care billing from .49% to greater than 2%.
                        Average gross charges per hour increased from $600 to over $900 for the
                        group.

November 2009 - 2016          Patient Care and Comfort Measures Initiative

                        Co-Authored patient care and comfort measures initiative with input from
                        nursing and physician staff and hospital leadership.  Created a new paradigm
                        in care of the emergency patient to address pain and suffering at check in, and
                        give nursing more clinical autonomy to initiate care measures.

**PUBLICATIONS:**

Lyon M, Brannam L, **Ciamillo L**, Blaivas M.  *False Positive Abdominal Aortic Aneurysm on Bedside
Emergency Ultrasound.*  Journal of Emergency Medicine. 2004; 26: 193-6.