# EXHIBIT A

JAMI LYNN GOLDEN,

    Plaintiff,

vs.

FLOYD HEALTHCARE
MANAGEMENT,
INC. d/b/a FLOYD EMERGENCY
PHYSICIANS GROUP, LLC,
GARRETT H. BARNES, M.D.,
CHARLES W. STEIN, N.P.,
DANNY R. ROGERS, P.A.,

    Defendants.

**Civil Action File No.**
**4:18-CV-157-MLB**

## RULE 26 REPORT OF KENT ISAAC COHEN, N.D, F.A.C.E.P.

### I.    STATEMENT OF OPINIONS, BASIS AND REASONS FOR OPINIONS

It is my understanding that the standard of care relative to the practice of medicine is that care that a reasonable medical provider would render under like and similar surrounding circumstances. This standard of care applies to physicians, nurse practitioners and physician assistants alike; i.e., that care that a reasonable physician would render, that care that a reasonable nurse practitioner would render, and that care that a reasonable physician assistant would render, respectively, under like and similar circumstances. It is my opinion that at all times pertinent,

Dr. Garrett Barnes ("Dr. Barnes"), Nurse Practitioner Stein ("NP Stein"), and Physician Assistant Rogers ("PA Rogers") acted at or above the applicable standard of care in the care and treatment of Jami Lynn Golden on the night of July 1, 2016 through her discharge from Floyd Medical Center's Emergency Department ("Floyd ED") in the early morning hours of July 2, 2016. In forming my opinions in this matter, I reviewed and rely on those materials set forth in Section II of this Report, which evidence the following:

At the time of her presentation to Floyd Medical Center's Emergency Department in July of 2016, Ms. Golden was a twenty-two-year-old female with a one-month history of right lower quadrant pain. She had previously sought treatment for the unexplained right lower quadrant pain at Redmond Regional Medical Center on June 22, 2016, where emergency room providers had concern for appendicitis. A CT Scan ruled out appendicitis, but the source of pain was not identified and Ms. Golden was discharged with an order to follow up with a gynecologist. On June 30, 2016, Ms. Golden presented to the obstetrics and gynecology division of Northwest Georgia Medical Clinic, PC with complaints of pelvic pain focused in the right lower abdominal quadrant. Kristen Leezer, M.D., evaluated Ms. Golden; a urinalysis was performed and was positive for hematuria. Dr. Leezer prescribed a three-day course of antibiotics for a presumed urinary tract

infection, ordered urine cultures, and scheduled a pelvic ultrasound. It was

subsequently confirmed the urine cultures were negative for an infection. It was

also confirmed that Ms. Golden did not start the antibiotic course.

On the evening of July 1, 2016, Ms. Golden presented to the Floyd ED after

experiencing increasing complaints of abdominal pain throughout the afternoon

and developing nausea. Ms. Golden was triaged at 8:29 p.m. and noted to have

chief complaints of generalized pain, chills, and nausea/vomiting "vague

complaints." Ms. Golden informed the triage nurse of the normal CT scan

performed at Redmond Regional Medical Center. Vital signs were taken and

charted as: oral temperature of 99.5 degrees Fahrenheit; blood pressure of 111/64;

heart rate of 118 bmp; and a respiratory rate of 20 breaths per minute with pulse

oxygenation of 99%. Ms. Golden's heartrate of 118 bpm[1] qualifies as tachycardia,

but is not overly concerning and could result from stress and pain, both of which

were applicable to Ms. Golden at that time. Ms. Golden was given a tracking

---

[1] As a result of my education, training and experience as an emergency medicine
physician, I am familiar with Systemic Inflammatory Response Syndrome ("SIRS
criteria"). SIRS is identified by two or more of the following: a fever over 100.4
degrees Fahrenheit; tachycardia greater than 90 bpm; tachypnea greater than 20
breaths per minute; and leukocytosis, leukopenia or bandemia of greater than ten
percent (10%). SIRS criteria are used as a screening measure to aid in the diagnosis
of sepsis; however, SIRS criteria are not exclusive to sepsis and are often found in
patients that are not septic.

acuity of "3-Urgent," and was admitted to the ED with Dr. Barnes as her attending physician. Ms. Golden's first mid-level care provider, NP Stein, performed a physical exam of Ms. Golden at 8:45 p.m., which was unremarkable aside for vaginal pain, and obtained an oral history of nausea and constant vaginal pain, onset two weeks prior.

NP Stein ordered the following lab work and tests: Comprehensive Metabolic Panel, Complete Blood Count with auto differential, Complete Blood Count with manual differential, Lipase Level, Amylase Level, Urinalysis with instruction for microscopic review if indicated, urine pregnancy test, manual differential. Intravenous hydration of one-liter normal saline for fluid resuscitation was also initiated. The results of the urinalysis revealed results consistent with dehydration, which was addressed by the intravenous hydration. The results of the blood work-up documented a WBC of 4.9, which was on the low end of normal, and Bandemia of fifteen percent (15%), a slight left shift. Ms. Golden's medical records document that NP Stein received and reviewed the results of the laboratory work ordered for Ms. Golden. Due to Ms. Golden's complaints of nausea, NP Stein ordered ondansetron (Zofran) and promethazine (Phenergan), with good results. For complaints of vaginal pain, NP Stein ordered and attempted to perform a vaginal exam with vaginal swabs to rule out vaginal infection. NP Stein was

unable to complete the exam, insert the speculum or obtain swabs due to complaints of pain; however, NP Stein was able to perform a bimanual exam, which revealed right lower quadrant tenderness. Consistent with the expressed complaints of right lower quadrant tenderness, NP Stein ordered a transabdominal and transvaginal pelvic ultrasound.

It appears NP Stein's shift ended at midnight, 12:00 a.m., on July 2nd, and Ms. Golden's case was handed off to PA Rogers shortly after midnight. At the time of handoff, NP Stein had formed a differential diagnosis that included abdominal pain, endometriosis, and ovarian cyst(s). It is my opinion, to a reasonable degree of medical certainty and probability, that these differential diagnoses were appropriate and consistent with Ms. Golden's symptomology, physical exam, and clinical presentation. Notably, while Ms. Golden's complaint of abdominal pain was consistent with a diagnosis of appendicitis, appendicitis has been previously ruled out by CT Scan. Yet, Ms. Golden's complaints of vaginal pain and right lower quadrant pain are also consistent with an ovarian cyst, ovarian torsion, or other ovarian abnormality. As such, it is my opinion that the differential diagnoses documented by NP Stein were appropriate and did not deviate from the applicable standard of care. Likewise, it was appropriate and within the standard of care for NP Stein to workup Ms. Golden as a patient experiencing ovarian cysts. Therefore,

it is my opinion, to a reasonable degree of medical certainty and probability, that NP Stein did not deviate from the standard of care in his evaluation, treatment, and diagnosis of Ms. Golden.

It is further my opinion, to a reasonable degree of medical certainty and probability, that NP Stein's plan of care and the course of treatment he prescribed for Ms. Golden did not deviate from the standard of care applicable to nurse practitioners in the emergency room setting; nor was NP Stein's failure to notify and consult Dr. Barnes regarding Ms. Golden's symptomology a deviation from the applicable standard of care. Ms. Golden's case and clinical presentation did not contain "red flags" that would have required Dr. Barnes to examine Ms. Golden or triggered a duty by NP Stein to consult Dr. Barnes. During the time NP Stein was involved in Ms. Golden's case, Ms. Golden had expressed complaints of chronic abdominal pain, but there was no clinical or physical evidence to indicate she was in extremis; nor was Ms. Golden exhibiting overt signs of sepsis. Notably, Ms. Golden's temperature was within normal limits, her blood pressure was within normal limits, her respiratory rate was within normal limits and there was no concerning source of infection.[2] While Ms. Golden's lab results did document

---

[2] I understand from reading the Affidavit of Louis P. Ciamillo, Jr., M.D., Plaintiff's expert, that Dr. Ciamillo is of the opinion that Ms. Golden was suffering from an abdominal infection while a patient at the Floyd ED; however, an exploratory

bandemia of fifteen percent (15%), this was not overly concerning as Ms. Golden

had a normal white blood cell count, evidence that she was not septic; further, the

mild bandemia could be consistent with the diagnoses considered by NP Stein. As

such, under the circumstances presented in Ms. Golden's case, the standard of care

did not require NP Stein to notify Dr. Barnes of Ms. Golden's case or seek Dr.

Barnes's guidance on a course of treatment and diagnosis.

    As noted, PA Rogers assumed care of Ms. Golden just after midnight on the

morning of July 2nd. At that time, the pelvic ultrasound had not been performed. It

is clear from the chart that PA Rogers saw and evaluated Ms. Golden, and

reviewed the laboratory work and results, finding the same to be unremarkable.

Notably, PA Rogers agreed with the differential diagnoses formed by NP Stein. PA

Rogers awaited the performance and results of the diagnostic pelvic ultrasound. At

12:58 a.m. on July 2nd, Ms. Golden complained of "9 out of 10" pain; PA Rogers

ordered 4 mg of morphine and an additional dose of Zofran, which were

administered shortly after 12:58 a.m. It is notable that at 1:54 a.m. on July 2, 2016,

Ms. Golden's vital signs were documented as follows: temperature of 98.0 degrees

---

laparotomy performed on July 2, 2016 at Redmond Regional Medical Center did
not reveal any abdominal source of infection. As such, I disagree with Dr.
Ciamillo's opinion of abdominal sepsis; the results of the exploratory laparotomy
further support my opinion that Ms. Golden was not septic at the time of her
treatment at the Floyd ED.

Fahrenheit; respiratory rate of 17 bpm; heart rate of 100 bpm; and blood pressure of 88/55, which is considered a low blood pressure. The drop in blood pressure, while notable, is not overly concerning and is easily explained as a reaction to the administration of morphine. Additionally, low blood pressure is not abnormal in a young, healthy woman like Ms. Golden. Further, it appears Ms. Golden's blood pressure recovered prior to discharge; additional evidence that the decline in blood pressure was due to the administration of opioid pain medication, as opposed to a clinical symptom of sepsis.

The pelvic ultrasound was performed at 1:38 a.m.; both transabdominal and transvaginal images were obtained. The preliminary radiology report documents an impression that is positive for peripheral ovarian follicles that could relate to polycystic ovarian syndrome; a bicornate uterus was also noted. The final radiology report is consistent with the preliminary report and documents a bicornate uterus and multiple small cysts at the ovaries bilaterally. The preliminary radiology report was received and reviewed by PA Rogers. PA Rogers made a final diagnosis of female pelvic pain, unknown cause. PA Rogers prescribed oral Zofran, 4 mg tablets, and Percocet for pain. At 3:02 a.m., PA Rogers discharged Ms. Golden from the Floyd ED; her condition is noted to be improved and stable at that time. It is my opinion, to a reasonable degree of medical certainty and

probability, that PA Rogers did not deviate from the standard of care applicable to physician assistants in the emergency room setting. PA Rogers examined Ms. Golden and reviewed the orders and lab work, and agreed with the differential diagnoses entertained by NP Stein. Notably, the pelvic ultrasound was consistent with possible ovarian cysts and it was reasonable and appropriate to diagnose Ms. Golden with female pelvic pain. Further, it is my opinion, to a reasonable degree of medical certainty and probability, that PA Rogers did not deviate from the applicable standard of care in discharging Ms. Golden as her condition had improved, was managed with the administration of medication, and she was medically stable at the time of discharge. Notably, Ms. Golden's pulse had decreased at the time of discharge, her blood pressure had normalized, her temperature was within normal limits, and she was not significantly dehydrated; all clinical indications that she was not septic at the time of her discharge. As such, the circumstances of Ms. Golden's case did not require PA Rogers to notify Dr. Barnes of Ms. Golden's case and seek guidance prior to discharge.

As such, based on my experience, knowledge and medical training, and after review of the forgoing medical records and those materials noted in Section II, it is my opinion, to a reasonable degree of medical certainty and probability that the care and treatment rendered by NP Stein and PA Rogers met or exceeded the

standard of care applicable in the emergency medical setting. It is further my opinion, to a reasonable degree of medical certainty and probability, that Dr. Barnes did not have a duty to personally examine Ms. Golden prior to her discharge. The clinical evidence of record documents that Ms. Golden was not in extremis at any time during her treatment at the Floyd ED, nor was there evidence that Ms. Golden was septic prior to, or at the time of her discharge from the Floyd ED. At all times that she was a patient at Floyd Medical Center, including at the time of her discharge, Ms. Golden was in stable medical condition. Furthermore, while Ms. Golden did meet certain SIRS criteria during her treatment at the Floyd ED, positive SIRS criteria do not conclusively establish sepsis as non-septic patients can also exhibit SIRS criteria. Nor are SIRS criteria a measurement of the standard of care. SIRS criteria are guidelines for treatment but are not a hard and fast set of rules that medical providers must stick to in order to adhere to the standard of care. In fact, current guidelines show that SIRS criteria are a poor screening mechanism for sepsis. While Ms. Golden did exhibit SIRS criteria, Ms. Golden's physical presentation was not consistent with a diagnosis of sepsis but was more reasonably consistent with a benign process. As such, it is my opinion, to a reasonable degree of medical certainty and probability, that Ms. Golden was not septic at the time of her treatment at the Floyd ED. As such, there was no treatment

that NP Stein, PA Rogers, or Dr. Barnes could have rendered to Ms. Golden while a patient in the Floyd ED that would have changed Ms. Golden's ultimate outcome and no deviations from the standard of care occurred.

## II.    FACTS AND DATA CONSIDERED IN FORMING OPINIONS

I have reviewed the following materials pertaining to the care and treatment provided to Ms. Golden in this case:

1. Medical records of Jami Lynn Golden from Floyd Medical Center;

2. Medical records of Jami Lynn Golden from Northwest Georgia Medical Clinic, P.C.;

3. Medical records of Jami Lynn Golden from Harbin Clinic;

4. Medical records of Jami Lynn Golden from Redmond Regional Medical Center;

5. Medical records of Jami Lynn Golden from University of Alabama at Birmingham Hospital;

6. Patient prescription record for Jami Lynn Golden from CVS Pharmacy;

7. Complaint for Damages;

8. Affidavit of Louis P. Ciamillo, Jr., M.D.;

9. Deposition of Jami Lynn Golden and the exhibits thereto;

10. Deposition of Terri Golden;

11.   Deposition Mickey Golden;

12.   Deposition of Sarah Golden;

13.   Deposition of Rebecca Oswell Pilgreen;

14.   Deposition of Rachel Herrington;

15.   Deposition of Joshua Cutshall PA-C;

16.   Deposition of Kristen Leezer, M.D.;

17.   Deposition of John Hostetler, M.D.;

18.   Deposition of Suzie Julian.

These materials in part form the basis of my opinions as stated above. I reserve the right to amend this statement if new information becomes available through the course of discovery that is not currently known to Defendants. I will also base my opinions on my training, education and experience, as detailed in my Curriculum Vitae ("CV") attached hereto.

### III.   EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS RENDERED

I am not aware of any exhibits at this time except for the medical records and exhibits to depositions set forth in Section II. Should any additional exhibits be used to summarize or support my opinions, those exhibits will be supplemented.

## IV.    QUALIFICATIONS

All qualifications are set forth in my CV, which is attached hereto as Exhibit "1." I have not authored any publications in the ten (10) years prior to the date of this Report.

## V.    TESTIMONY FROM PREVIOUS FOUR YEARS

The following is a list of cases in which I have testified as an expert at trial or by deposition during the previous four (4) years:

*Pemberton v. Fortich* (C. Kelly) (deposition on May 25, 2017; trial testimony on August 10, 2017);

*Lockhart v. Bloom* (The Weathington Firm) (Deposition on July 16, 2017);

*Watts v. Tabuteau* (The Weathington Firm) (Deposition on September 6, 2018);

*Davis v. Rios* (Owen, Gleaton, Egan, Jones & Sweeney, LLP) (Trial testimony on December 19, 2019);

*Allen v. Weirs* (Brinson, Askew, Berry, Seigler, Richardson & Davis, LLP) (Trial testimony on March 14, 2019);

*Moss v. Stokes* (A. Spier) (Deposition on April 29, 2019);

*Bolden v. Chakravarthy* (The Weathington Firm) (Deposition May 20, 2019);

*Long v. Segal* (The Weathington Firm) (Deposition March 27, 2019);

*Cheves v. Young* (The Weathington Firm) (Deposition August 8, 2019).

## VI. STATEMENT OF COMPENSATION

I am being compensated at the following rates: $400.00 per hour for review of case materials and medical records; $650.00 per hour for deposition appearance; $750.00 per hour for appearance at trial and trial testimony.

Respectfully submitted this _11th_ day of _June_, 2020.

Kent Isaac Cohen, MD, FACEP

# **EXHIBIT 1**

### Kent Isaac Cohen, MD, FACEP
485 Londonberry Rd NW
Atlanta, GA 30327
(404) 256-4329
Cell (404) 272-2754

---

## GRADUATE MEDICAL EDUCATION

**Orlando Regional Medical Center**
Orlando, Florida
     EMERGENCY MEDICINE RESIDENCY     *JULY 1986-JUNE 1989*

---

**Emory University School of Medicine**
Atlanta, Georgia
     DOCTOR OF MEDICINE 1986

**University of Georgia**
Athens, Georgia
     BACHELOR OF SCIENCE, MICROBIOLOGY 1982

---

## PROFESSIONAL EXPERIENCE

**Gwinnett Health System**
Lawrenceville, GA **JANUARY 2000-PRESENT**

**CURRENTLY EMPLOYED BY ENVISION HEALTH SERVICES**

     EMERGENCY DEPARTMENT, STAFF PHYSICIAN
          2000-Present
     CHIEF, EMERGENCY DEPARTMENT
          2006-2013
     ASSOC. MEDICAL DIRECTOR, EMERGENCY DEPARTMENT
          2013-PRESENT

**Rooms to Go**
     MEDICAL DIRECTOR, OCCUPATIONAL MEDICINE
          2017-PRESENT

**Balanced Bodies Anti-Aging Clinics**
     MEDICAL DIRECTOR AND CO-OWNER
          2017-PRESENT

**Wellstar Health Network**
Austell, GA
Includes Wellstar Cobb, Kennestone, Paulding and Douglas Hospitals
EMERGENCY DEPARTMENT, STAFF PHYSICIAN

JANUARY 1998-December 2001

**North Fulton Regional Medical Center**
Roswell GA
EMERGENCY DEPARTMENT, STAFF PHYSICIAN

December 1998- December 2001

**Fort Walton Beach Medical Center**
Fort Walton Beach, FL
EMERGENCY DEPARTMENT, STAFF PHYSICIAN

May 2000- December 2001

**Twin Cities Hospital**
Niceville, FL
EMERGENCY DEPARTMENT, STAFF PHYSICIAN

April 1999- December 2001

**Eastside Medical Center**
Snellville, GA
EMERGENCY DEPARTMENT, STAFF PHYSICIAN

April 1996- December 1998

**BJC Medical Center**
Commerce, GA
EMERGENCY DEPARTMENT, MEDICAL DIRECTOR

January 1996-April 1999

**Emory University School of Medicine**
Atlanta, Georgia
DEPARTMENT OF SURGERY, DIVISION OF EMERGENCY MEDICINE

Assistant Professor, Emergency Medicine Residency

May 1994-April 1996

**Jackson County EMS**
Jefferson, Georgia
MEDICAL DIRECTOR

1997-1999

**Medstar Ambulance Services**
Atlanta, Georgia
MEDICAL DIRECTOR

1994-1996

**Medical Center of Central Georgia**
Macon, Georgia
STAFF PHYSICIAN
EMERGENCY DEPARTMENT

1990-2002

**Mount Sinai Medical Center**
Miami Beach, Florida
STAFF PHYSICIAN
EMERGENCY DEPARTMENT

MAY 1994-JUNE 1996

**Dunwoody Medical Center**
Atlanta, Georgia
STAFF PHYSICIAN

JULY 1993-MAY 1994

**Washington University School of Medicine (Barnes Hospital)**
St. Louis, Missouri
CLINICAL INSTRUCTOR,
EMERGENCY DEPARTMENT

January 1991-July 1993

**USAF Scott Medical Center**
Scott AFB, Illinois
MEDICAL DIRECTOR, EMERGENCY DEPARTMENT

JULY 1989-JUNE 1993

---

# ACADEMIC APPOINTMENTS

*Gwinnett Medical Residency Programs*

*CLINICAL INSTRUCTOR, EMERGENCY DEPARTMENT*

2014-Present

*Philadelphia College of Osteopathic Medicine*

*CLINICAL ASSSITANT PROFESSOR OF, EMERGENCY MEDICINE*

2009-Present

*Emory University School of Medicine*
*DEPARTMENT OF SURGERY, DIVISION OF EMERGENCY MEDICINE*

*ASSISTANT PROFESSOR*

*ASSISTANT DIRECTOR, EMERGENCY MEDICINE RESIDENCY*

**Washington University School of Medicine,**                                    1994-1996

*ST. LOUIS, MISSOURI*

*CLINICAL INSTRUCTOR*

1991-1993

**Saint Louis University, St. Louis, Missouri**

*CLINICAL INSTRUCTOR, PHYSICIANS ASSISTANT PROGRAM*

1990-1993

_____

## L I C E N S U R E

**State of Georgia**

**#30981**

**State of Florida**

**#50971 RESIGNED 2005**

**State of Illinois (Inactive)**

**#036-084720**

**State of Alabama**

**#18896 RESIGNED 2003**

**State of Missouri (Inactive)**

**#R3M56**

## P R O F E S S I O N A L   M E M B E R S H I P S

**American College of Emergency Physicians, *FACEP***
Member 1986-Present

**Southern Medical Association**
Chairman, Emergency Medicine Section     1995-1999
Member 1993-2000

## CERTIFICATIONS

**American Board of Emergency Medicine**

Recertificaiton 2001, 2011

## MILITARY EXPERIENCE

**Major, United States Air Force**                              *1982-1994*

*Honorable Discharge*

*Desert Storm Service Ribbon*

## REFERENCES

***Available Upon Request***